IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:13-CV-167-FL

| | |
|---|---|
| KAREN HORNE, ) | |
| ) | |
| Plaintiff/Claimant, ) | |
| ) | |
| ) | **MEMORANDUM AND** |
| v. ) | **RECOMMENDATION** |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on the parties' cross motions for judgment on the pleadings [DE-25, -29] pursuant to Fed. R. Civ. P. 12(c). Claimant Karen Horne ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial review of the denial of her application for a period of disability and Disability Insurance Benefits ("DIB"). The time for filing responsive briefs has expired, and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, it is recommended that Claimant's Motion for Judgment on the Pleadings be denied and Defendant's Motion for Judgment on the Pleadings be allowed, upholding the final decision of the Commissioner.

## I. STATEMENT OF THE CASE

Claimant filed an application for a period of disability and DIB on April 23, 2010, alleging disability beginning May 8, 2009. (R. 9, 208-14). Her claims were denied initially on September 21, 2010, and upon reconsideration on January 7, 2011. (R. 73-87, 103, 105-21). On January 23, 2012, Claimant amended her onset date to March 1, 2010, but later withdrew the amendment. (R. 70, 225). A hearing before Administrative Law Judge Christopher Willis ("ALJ") was held on

January 26, 2012, at which Claimant, who was represented by counsel, appeared and testified and Claimant's husband appeared but did not testify. (R. 26-72). A vocational expert ("VE") appeared by telephone and testified. (R. 61-72). On April 18, 2012, the ALJ issued a decision denying Claimant's request for benefits. (R. 6-20). Claimant then requested a review of the ALJ's decision by the Appeals Council, and submitted additional evidence as part of her request. (R. 203-07). On June 24, 2013, after reviewing and incorporating the additional evidence into the record, the Appeals Council denied Claimant's request for review. (R. 1-5). Claimant then filed a complaint in this court seeking review of the now final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded*

2

*by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. § 404.1520 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 404.1520a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 404.1520a(e)(3).

3

In this case, Claimant alleges the ALJ improperly evaluated her credibility and Residual Functional Capacity ("RFC"). Pl.'s Mem. [DE-26] at 6-8.

## IV. FACTUAL HISTORY

### A. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant had not engaged in substantial gainful employment since the alleged onset date. (R. 11). Next, the ALJ determined Claimant had the following severe impairments: seizure disorder, diabetes mellitus, and hypertension with left ventricular hypertrophy, arthritis, obesity and major depression. *Id.* However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 12). Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in mild restriction in her activities of daily living and maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation, each of extended duration. *Id.*

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform light work[1] with the following limitations:

> [S]he is limited to occasional pushing, pulling, and operating foot controls with both lower extremities. She is limited to occasional climbing ramps and stairs, balancing,

---

[1] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If an individual can perform light work, he or she can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

stooping, kneeling, crouching, and/or crawling, but no climbing ladders, ropes or scaffolds. She must avoid concentrated exposure to workplace hazards, such as unprotected heights and dangerous moving machinery. The claimant is further limited to no driving as part of the job. The claimant is capable of performing simple, routine, repetitive tasks, but no production rate/pace work. Lastly, the claimant would be able to sit or stand at will for up to 75% of the workday.

(R. 13). In making this assessment, the ALJ found Claimant's statements about her limitations not fully credible. (R. 13-18). At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of her past relevant work as a home health aide and vehicle escort. (R. 18). Nonetheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. *Id.*

## B. Claimant's Testimony at the Administrative Hearing

At the time of Claimant's administrative hearing, Claimant was 51 years old and living with her husband. (R. 34, 47). Claimant graduated from college with a B.S. degree in nursing. (R. 34). Claimant worked from January 2001 to May 2003 as a nurse assistant on the mid-surgical floor of a hospital. *Id.* Her duties included, among other things, taking blood pressures, setting up IVs, placing catheters, bathing patients, and changing sheets, some of which involved lifting patients. (R. 35). From May to October 2003, Claimant worked at McDonald's. *Id.* From July 2005 to August 2008, Claimant worked occasionally driving a pilot leader car used in transporting mobile homes and also worked at Subway. (R. 37-38). From December 2008 to May 2009, Claimant worked in a call center. (R. 38-39). From October 2009 to March 2010, Claimant worked one to two days a week helping a friend care for two to four year olds in a day care center. (R. 39). Claimant worked for approximately a month at a grocery store, but had difficulty lifting and standing

5

for the required seven hours a day and had to take alternating days off to physically recover from her shift. (R. 39-40, 58-59).

Claimant explained numerous medical conditions supporting her disability claim and her inability to work full-time. In February 2003, Claimant first saw an orthopedist for swelling in her knees and had fluid drained from her knees, followed by an injection, three times in 2003. (R. 36). About that time, she also had her gall bladder and an ovary removed and her then-husband had a major heart attack and stroke. (R. 36-37). Claimant could not manage working at night and taking her then husband to medical appointments, so she left her job at the hospital and took a part-time job working at McDonald's. (R. 37). Claimant had two surgeries on her left knee and one on her right knee, the last occurring in 1997. *Id.* Claimant brought a cane to the hearing, which she acquired in 1981 when she first began suffering from knee problems, used off and on over the years (but not while working at the daycare or grocery jobs), and started using again in June 2011, when she fell and twisted her knee after having a seizure. (R. 40). In July 2011, Claimant twisted her knee again, went to the hospital, and utilized crutches for six weeks. (R. 41). Claimant visited her doctor in follow-up when her knee did not improve and eventually transitioned from crutches to a cane. *Id.* She uses her cane for walking, balancing, and when getting in and out of a chair, and always takes her cane when leaving the house. (R. 51-52).

Claimant experienced three or four major seizures in the year preceding the hearing. (R. 45). Her seizures are preceded by a headache or confused, unclear feeling in her head, and after experiencing a seizure she loses consciousness and awakes four or five hours later not knowing what happened. *Id.* Two to three times weekly Claimant experiences less intense seizures and shakes uncontrollably on her right side for fifteen to twenty minutes. (R. 46). Claimant's major seizures

are controlled by medication, but she still experiences minor seizures and, as a result, lost her driver's license. *Id.* Claimant had not driven a car for two years. *Id.*

Claimant is 5 feet 5 inches tall and weighed 242 pounds at the time of the hearing, having gained roughly 80 pounds over the prior few years due to being less active. (R. 50). Claimant used to camp, bowl, hike, dance, play soccer, and hunt, but now the extent of her physical activity is walking to the mailbox. (R. 50-51). Claimant no longer takes vacations, because it is too difficult for her to walk around. (R. 51). Claimant described her days as fair, poor, and worse. (R. 47). In a month, she has approximately five to six fair days, ten to eleven poor days, and the remaining days are worse, mostly spent sitting in a recliner or in bed. (R. 58).

On a fair day, Claimant wakes up, her husband assists her with entering and exiting the shower (she has fallen before trying to balance on one leg to step into the bathtub), she dresses, and then rests for 30 to 45 minutes in a recliner (R. 47-48); sometimes she cooks breakfast, utilizing a barstool to sit at the sink or stove while making eggs or toast, but oftentimes her husband makes breakfast (R. 48); and after breakfast she may start a load of laundry, *id.* After breakfast on a poor day Claimant may watch television or crochet, and on a worse day she may go back to bed for an hour and then watch television with her husband. *Id.* Claimant typically has a sandwich or soup for lunch, but cannot stand long enough to boil a pot of soup, and then takes and hour to hour and a half long nap so that she has energy to get through the rest of the day. (R. 48-49). After napping, on a fair day, Claimant finishes the laundry and plans dinner. (R. 49). She may start prepping food at 4:00 p.m., rest for 20 minutes, return to the kitchen to continue prepping, rest again, and continue in this manner until dinner is ready. *Id.* After dinner, Claimant watches television and works crossword puzzles or crotchets. *Id.* On Wednesday nights, Claimant and her husband prepare and

7

deliver dinner to his parents, who are unable to cook for themselves. *Id.* Claimant attends Sunday school on Sunday mornings, but used to go to church three nights a week when she had more energy. (R. 49-50).

Claimant constantly experiences pain in varying degrees. (R. 52). Her left knee aches all the time and walking any distance or sitting for more than 20 minutes is very painful. (R. 52, 55). As the day progresses, Claimant is able to sit for less time without alternating positions. (R. 55-56). Claimant rated the severity of her knee pain to be a seven out of ten on average. (R. 53). Claimant's pain is reduced to a tolerable level, four out of ten, by medication when she can afford to fill her prescriptions, but her knee still feels unstable. (R. 53-54). Claimant also experiences back pain. (R. 54). She is unable to lift an object below her waist weighing more than ten pounds and cannot squat at all, bend more than 45 degrees, kneel or stoop. (R. 56-58). She can lift an object above her waist weighing up to 20 pounds utilizing only her arms and is able to bathe her small dog in the sink. (R. 57).

Claimant has been prescribed, among other drugs, Protonix for nausea and vomiting, which may be caused by tumors in her abdomen, Trichlor for cholesterol, Novolog Atlantis for diabetes, Depakote for seizures, Celexa for depression, and Tramadol and Oxycodone for pain, but due to lack of funds stopped taking medications in December 2011, with the exception of occasional samples received from her doctor. (R. 41-44).

## C. Vocational Expert's Testimony at the Administrative Hearing

Coraetta Harrelson testified as a VE at the administrative hearing. (R. 62-69). After the VE's testimony regarding Claimant's past work experience (R. 62), the ALJ asked the VE to assume a hypothetical individual of the same age, education and prior work experience as Claimant and

8

posed two hypothetical questions. First, the ALJ asked whether the individual could perform Claimant's past relevant work assuming the following:

> This hypothetical individual is limited to equivalent work at no greater than a light level of exertion as that term is defined in the regulations which generally includes lifting, carrying and pushing and/or pulling up to 20 pounds occasionally, 10 pounds frequently, sitting, standing and/or walking for periods up to six hours each in an eight hour work day with normal breaks. This individual with respect to both lower extremities is limited to no more than occasional pushing, pulling, operating foot controls. Individual's [sic] limited to no more than occasional climbing ramps or stairs, no climbing ladders, ropes, scaffolds, occasional balancing. Let's just say occasional -- all -- occasional posture activities to include climbing ramps, stairs, balancing, stooping, kneeling, crouching, crawling but no climbing ladders, ropes, scaffolds. The individual would need to avoid concentrated exposure to work place hazards such as dangerous moving machinery and unprotected heights. The individual would be restricted to simple, routine, repetitive tasks. The individual would need to avoid driving. As part of avoiding concentrated exposure to workplace hazards I'm just going to add no driving considering the medical statement I have in the file from her treatment provider. I'd say no production rate work, or production pace work rather.

(R. 62-63). The VE responded that the individual could perform Claimant's past work as a telephone information clerk and fast food worker.[2] (R. 63-64). The ALJ next asked if there was any other work that the individual could perform, to which the VE responded that the individual could perform the jobs of storage facility rental clerk (DOT # 295.367-026), work ticket distributor (DOT # 221.667-010), and shipping/receiving weigher (DOT # 222.387-074). (R. 64-65). The ALJ next inquired as to whether modifying the first hypothetical to include a sit/stand option would preclude any of the jobs identified, to which the VE responded that the individual would be able to sit or stand 75 percent of the time (four to five hours of the work day) in the work ticket distributor position and in the shipping and weighing position, but the other positions would not allow for a sit or stand

---

[2] The ALJ subsequently elicited testimony from the Claimant that she performed the telephone information clerk job on a part-time basis due to her seizures and earned roughly $400 monthly. (R. 67-68). The ALJ further concluded that neither of these jobs qualify as past relevant work. (R. 18).

9

option. (R. 65-67). The VE noted that generally in the national economy, with respect to light, unskilled jobs, the employee does not have the opportunity to determine how they do the job and in what manner, so that if the job requires a majority of standing the individual would have to be able to stand. (R. 66). The VE's testimony regarding a sit/stand option was from her own experience and not the DOT. (R. 67). Claimant's attorney elicited testimony from the VE clarifying that the sit/stand option would allow the individual to sit or stand at will and that in performing the job the individual may have to walk some during the day, but that any non-work related excess time away for the workstation would not be allowed. (R. 68-69).

## V. DISCUSSION

### A. The ALJ's Assessment of Claimant's Credibility

Claimant contends the ALJ improperly discounted Claimant's credibility, resulting in an RFC inconsistent with her testimony. Pl.'s Mem. at 6-8. The Commissioner counters that the ALJ properly evaluated Claimant's credibility and the RFC is supported by substantial evidence. Def.'s Mem. [DE-30] at 14-19. The undersigned finds no error in the ALJ's credibility assessment or resulting RFC determination.

It is within the province of the ALJ to determine a claimant's credibility. *See Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) ("Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight."). Federal regulation 20 C.F.R. § 404.1529(a) provides the authoritative standard for the evaluation of subjective complaints of pain and symptomology, whereby "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *Craig*, 76 F.3d at 593-94. First, the ALJ must objectively determine whether the claimant

10

has medically documented impairments that could cause his or her alleged symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Hines v. Barnhart*, 453 F.3d 559, 564 (4th Cir. 2006). If the ALJ makes this first determination, he must then evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work," *Craig*, 76 F.3d at 595, and whether the claimant's statements are supported by the objective medical record. SSR 96-7p, 1996 WL 374186, at *2; *Hines*, 453 F.3d at 564-65. Objective medical evidence may not capture the full extent of a claimant's symptoms, so where the objective medical evidence and subjective complaints are at odds, the ALJ should consider all factors "concerning the individual's functional limitations and restrictions due to pain and other symptoms." SSR 96-7p, 1996 WL 374186, at *3 (showing the complete list of factors). The ALJ may not discredit a claimant solely because his or her subjective complaints are not supported by objective medical evidence. *See Craig*, 76 F.3d at 595-96. But neither is the ALJ required to accept the claimant's statements at face value–he "must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." SSR 96-7p, 1996 WL 374186, at *3; *see also Taylor v. Astrue*, No. 5:10-CV-263-FL, 2011 WL 1599679, at *4-8 (E.D.N.C. Mar. 23, 2011) (memorandum and recommendation finding the ALJ properly considered the entire case record to determine that Claimant's subjective complaints of pain were not entirely credible), *adopted by* 2011 WL 1599667 (E.D.N.C. Apr. 26, 2011).

An individual's RFC is the capacity which the individual possesses despite the limitations caused by his physical or mental impairments. 20 C.F.R. § 404.1545(a)(1); *see also* SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The ALJ's determination of RFC is based on all relevant medical and other evidence in the record and may include a claimant's own description of limitations arising from alleged symptoms. 20 C.F.R. § 404.1545(a)(3); *see also* SSR 96-8p, 1996 WL 374184,

11

at *5. Where a claimant has numerous impairments, including non-severe impairments, the ALJ must consider their cumulative effect in making a disability determination. 42 U.S.C. § 423(d)(2)(B); *see Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989) ("[I]n determining whether an individual's impairments are of sufficient severity to prohibit basic work related activities, an ALJ must consider the combined effect of a claimant's impairments.") (citations omitted). The ALJ has sufficiently considered the combined effects of a claimant's impairments when each is separately discussed by the ALJ and the ALJ also discusses Claimant's complaints and activities. *Baldwin v. Barnhart*, 444 F. Supp. 2d 457, 465 (E.D.N.C. 2005) (citations omitted). The RFC assessment "must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." SSR 96-8p, 1996 WL 374184, at *7.

Here, the ALJ found that Claimant had medically determinable impairments reasonably capable of causing her alleged symptoms, but concluded the asserted limitations resulting from these impairments were not fully credible. (R. 13). In reaching this conclusion, the ALJ discussed at length medical records concerning Claimant's history of seizures, diabetes, hypertension, arthritis/knee pain, obesity, and depression. (R. 13-16). The ALJ also discussed Claimant's testimony from the administrative hearing, a third-party assessment provided by Claimant's husband, and medical opinion evidence from Claimant's treatment providers and the State agency medical consultants. (R. 13, 16-18). Despite the ALJ's thorough treatment of the evidence, Claimant contends that the ALJ improperly evaluated Claimant's credibility and that, as a result, the ALJ's RFC determination is inconsistent with Claimant's testimony.

Claimant recounts her testimony, which she contends the ALJ improperly rejected–that she

12

stopped working due to knee pain, had been utilizing a cane to walk since 2011 when she exacerbated her knee impairment, could not pay for medications, was no longer able to be active and had gained 80 pounds, had difficulty entering and exiting the shower, averages a pain level of seven out of ten, was unable to lift more than 10 pounds and could not bend over, and that most of her days were "bad days" and she had to lie down most of the time. Pl.'s Mem. at 6-7. Importantly, while not required to discuss every piece of evidence, *McLamb v. Astrue*, No. 5:08-CV-305-FL, 2009 WL 2046062, at *2 (E.D.N.C. July 14, 2009) (citations omitted), the ALJ acknowledged in his decision the salient points testified to by Claimant. These include Claimant's testimony regarding her inability to work due to knee problems; difficulty sitting, lifting, squatting, bending, stooping, kneeling, walking, and standing for prolonged periods; problems accessing her medications due to financial difficulties;[3] the severity of her pain; and her use of a cane. (R. 13-16). However, the ALJ determined that the objective evidence did not suggest Claimant's knee impairment was entirely disabling as she contends, citing specific reasons, such as a November 2010 physical exam where her gait was within normal limits despite knee pain with manipulation and an x-ray showing minimal degenerative changes. (R. 16, 365-69). The ALJ summarized his credibility and RFC determinations as follows:

> In making these findings, the undersigned has credited the claimant's testimony and statements about her limitations, as well as her husband's; however, the weight of the evidence addressed herein does not support a debilitating degree of impairment. Certainly, the evidence does not support her need for an assistance device for ambulation, which both consultative doctors noted in their reports. For instance, Dr. Owen cited moderate-to-severe difficulty lifting, handling, and carrying objects, but noted normal gait and station (Exhibit 8F). The claimant's knees were negative for anterior and posterior drawer signs, and she ambulated around the room without

---

[3] A review of the ALJ's opinion does not indicate that the ALJ discounted Claimant's credibility based on her lack of funds to seek medical treatment or obtain medication, and Claimant does not argue as much.

13

significant difficulty, as well as got on and off the exam table. Dr. Murfin noted that the claimant's arm strength was normal and the strength in her legs appeared normal (Exhibit 6F). She walked with a slight limp, but did so unassisted, and she could walk tandem and on heels an toes.

In sum, the above residual functional capacity assessment is supported by the claimant's longitudinal treatment record, which shows an essentially stable condition. Although the claimant still complains of knee pain, her condition has remained controlled. The claimant's medical history, including seizures and depression, has been taken into account in determining the aforementioned residual functional capacity. The claimant's history of obesity has also been taken into account in making this determination. Her subjective allegations, which have been partially credited, have been considered as well. The undersigned finds that this residual functional capacity is consistent with the medical record as a whole.

(R. 17-18). Claimant specifically takes issue with the ALJ's reliance on objective evidence indicating mild findings on Claimant's X-ray, her normal gait in November 2010, and her failure to utilize a cane during consultative examinations. Pl.'s Mem. at 7-8.

First, Claimant contends that the ALJ's reliance on an x-ray indicating "minimal degenerative changes" was misplaced, arguing that "[c]ourts have noted that the word mild 'used in a technical, medical sense does not necessarily translate directly to a corresponding quantifiable level of pain…the medical or technical use of a term to interpret a condition seen on an x-ray or MRI should not be automatically assumed to apply as well to the level of pain that a condition can be expected to produce.'" Pl.'s Mem. at 7 (citing *Walker v. Astrue*, No. 2:03-078, 2008 WL 4722121, *10 (M.D. Tenn. Oct. 21, 2008); *Newkirk v. Colvin*, No. 7:12-CV-200-BO, 2013 WL 4828573, *3 (E.D.N.C. Sep. 10, 2013)). The ALJ found Claimant's arthritis (knee impairment) to be severe, then properly proceeded to evaluate the limiting effects of this severe impairment by considering both subjective and objective evidence, including Claimant's x-ray results. *See Hines*, 453 F.3d at 565 n.3 ("While objective evidence is not mandatory at the second step of the test, '[t]his is not to say, however, that

14

objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are.'") (quoting *Craig*, 76 F.3d at 595). The ALJ did not rely solely on the "minimal degenerative changes" indicated by the x-ray results in discounting Claimant's testimony regarding the limitations caused by her knee pain. The ALJ also cited examination results indicating Claimant had normal strength in her legs and a normal gait at times, while at other times Claimant could walk unassisted without significant difficulty (although with a limp). (R. 16-18). Thus, the ALJ's decision demonstrates he considered the x-ray indicating "minimal degenerative changes" in the context of the entire record and did not impermissibly assume a corresponding level of minimal pain. *See Melvin v. Astrue*, No. 7:11-CV-131-FL, 2012 WL 4447617, *8 (E.D.N.C. July 3, 2012) (finding no error in ALJ's reliance on medical records noting "mildly abnormal" findings or "minimal changes" when assessing claimant's credibility as to the limitations of her impairments), *adopted by* 2012 WL 4447607 (E.D.N.C. Sept. 25, 2012).

Claimant also points out that the ALJ failed to mention two pieces of evidence: Dr. Pecoraro's statements from a December 30, 2011 pain medicine consultation that "it is probable that [Claimant] will require total knee replacements" and that "[p]ain medications are certainly justified in this case given [Claimant's] knee pathology"[4] (R. 417); and Dr. Owen noted Claimant had pain with movement despite a normal gait (R. 367). Pl.'s Mem. at 7-8. However, these statements are not necessarily odds with the ALJ's credibility finding and RFC assessment. As discussed above,

---

[4] Claimant does not argue that Dr. Pecoraro's statements qualify as a "medical opinion" as defined in 20 C.F.R. § 404.1527(a)(2) or that the ALJ's failure to mention these statements is an independent basis for remand. *See Love-Moore v. Colvin*, No. 7:12-CV-104-D, 2013 WL 5366967, at *11 (E.D.N.C. Aug. 30, 2013) (distinguishing between treatment notes and medical opinions), *adopted by* 2013 WL 5350870 (E.D.N.C. Sept. 24, 2013).

15

the ALJ acknowledged the severity of Claimant's knee impairment, but the fact that she may require knee replacements at some point in the future does not dictate a finding that Claimant was disabled at the time of the ALJ's decision, which notably was issued within four months of Claimant's visit to Dr. Pecoraro. *See Goodwin v. Astrue*, No. 5:07-CV-00012, 2007 WL 2417133, at *3 (W.D. Va. Aug. 21, 2007) (concluding that while claimant's "status may deteriorate in the future . . . there is every reason to believe that [claimant] can engage in some forms of sedentary work activity at the present time."). Likewise, the fact that Claimant experienced knee pain and required pain medication as a result does not dictate a finding that she is disabled. *See Austin v. Colvin*, No. 7:13-CV-00251, 2014 WL 3661112, at *4 (W.D. Va. July 22, 2014) ("It must be recognized that the inability to do work without any pain or subjective manifestations does not of itself render a claimant totally disabled.") (citing *Craig*, 76 F.3d at 594-95).

Finally, Claimant contends that after she started utilizing a cane later in 2011, she was noted to walk with an antalgic gait (R. 415-18) and that the SSA worker assisting Claimant with her application noted Claimant had limitations in standing, sitting, and walking, had to change positions, and was slow in standing and walking (R. 229). Pl.'s Mem. at 8. The ALJ expressly discussed the 2011 treatment note to which Claimant refers, stating that during a December 30, 2011 pain medicine consultation, examination revealed Claimant had a "markedly antalgic gait" (R. 15), but concluded that other evidence of record suggested "claimant's gait has been described as normal at various times, which undermines her presentation to the pain doctor at Exhibit 11F" (R. 17). (R. 365-67, 415-17). As the ALJ noted, the record reflects conflicting evidence regarding Claimant's knee impairment. (R. 337-38, 341-42, 357-61, 365-67, 391-400, 415-18). When conflicting evidence is presented, the ALJ retains the discretion to resolve such inconsistencies. *Hayes v.*

16

*Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (citations omitted). Furthermore, the ALJ's RFC includes an option to "sit or stand at will for up to 75% of the workday," as well as lower extremity and postural limitations to account for some limitation resulting from Claimant's knee impairment, and the RFC formulated by the ALJ is more restrictive than the medium RFC suggested by Dr. Clayton, a state agency consultant. (R. 13-18).

In sum, the ALJ fully discussed the evidence of record, including Claimant's subjective complaints, and adequately explained his reasons for discounting Claimant's credibility, citing substantial evidence in the record. "Where the ALJ's determination of credibility is supported by such substantial evidence in the record, and where the ALJ had the opportunity to observe the demeanor of plaintiff in her testimony, it is not the province of the court to reweigh the evidence bearing upon credibility." *Melvin*, 2012 WL 4447607, at *3 (citing *Mickles v. Shalala*, 29 F.3d 918, 929 (4th Cir. 1994) (Luttig, J., concurring); *Shively*, 739 F.2d at 990)). Therefore, Claimant's contention that the ALJ erred in evaluating Claimant's credibility and RFC lacks merit.

## VI. CONCLUSION

For the reasons stated above, it is RECOMMENDED that Claimant's Motion for Judgment on the Pleadings [DE-25] be DENIED, Defendant's Motion for Judgment on the Pleadings [DE-29] be ALLOWED and the final decision of the Commissioner be UPHELD.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days upon receipt to file written objections, and responses thereto (if any) shall be filed within seven (7) days of receipt of the objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain

17

error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

SUBMITTED, this the 29th day of August 2014.

                                               Robert B. Jones, Jr.
                                               United States Magistrate Judge

18

Case 7:13-cv-00167-FL   Document 33   Filed 08/29/14   Page 18 of 18